**CROESUS EMTR MASTER FUND L.P., Polaris Prime Emerging Values Fund L.P., and Select Capital Limited, Plaintiffs,**

v.

**The FEDERATIVE REPUBLIC OF BRAZIL, Defendant.**

**No. CIV.A. 00–3032(JDB).**

United States District Court, District of Columbia.

July 30, 2002.

Andrew Neill Vollmer, Wilmer, Cutler & Pickering, Washington, DC, for Plaintiffs.

Alexander E. Bennet, Eli Whitney Debevoise, II, Mara V.J. Senn, Arnold & Porter, Washington, DC, for Defendant.

### MEMORANDUM OPINION

BATES, District Judge.

Three hedge funds bring this case against the Federative Republic of Brazil ("Brazil") for failure to pay the principal and interest on Brazilian bonds they currently hold. Presently before the Court is Brazil's motion to dismiss. For the reasons stated below, the motion is granted.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Croesus EMTR Master Fund L.P. ("Croesus"), Polaris Prime Emerging Values Fund L.P. ("Polaris"), and Select Capital Limited ("Select Capital") (collectively, "plaintiffs") are hedge funds holding bonds issued by Brazil in 1902 and 1911 (the "1902 and 1911 Bonds" or the "Bonds"). According to the complaint, Croesus, a Delaware limited partnership with its principal place of business in New York, acquired six hundred twenty-six 1902 Bonds in 1997. Compl. ¶¶ 1, 14. Polaris, a Delaware limited partnership with its principal place of business in South Carolina, acquired one hundred twenty 1902 Bonds between 1996 and 1998. *Id.* ¶¶ 2, 16. Select Capital, a Cayman Islands corporation with its principal place of business in the Cayman Islands, acquired one hundred fourteen 1902 Bonds and eight 1911 Bonds in 1998. *Id.* ¶¶ 3, 19–20. Each plaintiff alleges that its fund managers and most of its member partners or shareholders are U.S. citizens and that it maintains an account for cash and securities in New York. *Id.* ¶¶ 1–3. Plaintiffs also assert that many of their 1902 and 1911 Bonds were purchased in secondary markets in the United States. *See id.* ¶¶ 14, 19.

Plaintiffs allege that "[d]uring the last few years, many 1902 and 1911 bondholders have presented their Bonds to Brazil and demanded payment." *Id.* ¶ 24. Nevertheless, "Brazil refused to pay the bondholders after presentment and has publicly stated that it will not pay the 1902 Bonds or the 1911 Bonds." *Id.* Accordingly, plaintiffs allege, "[p]resentment and demand by the Plaintiffs ... would be futile, and they have not taken these steps." *Id.*

Brazil has not made interest payments or repayments of principal to the plaintiffs on the Bonds. *Id.* ¶ 25. According to plaintiffs, the amounts owing to them on the Bonds is over one hundred forty million dollars. *See id.* ¶¶ 15, 18, 22. Plaintiffs seek money damages equal to the full current value of the principal and interest owing on the bonds. *See id.* at p. 8.

Brazil moves to dismiss the complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, under the principles of forum non conveniens, and under the act of state doctrine. In support of its motion, Brazil submits a declaration from Fabio Barbosa, the Secretary of Brazil's National Treasury Secretariat, Ministry of Finance. *See* Declaration of Fabio Barbosa ¶ 1. Mr. Barbosa notes that the Bonds are registered bonds stated in Brazilian currency, that transfers of ownership of the Bonds could be effected only in Brazil where the records of ownership are maintained, and that payment of interest could be accomplished in person only at Brazil's Public Debt Office. *Id.* ¶¶ 4–14, 27. Mr. Barbosa explains that, in an effort to retire Brazil's outstanding internal debt obligations, Brazil in 1962 allowed for a five-year period during which the 1902 and 1911 Bonds could be exchanged for different securities, and at the end of which the Bonds were to become valueless. *Id.* ¶¶ 18–20. In 1967, Brazil also issued a decree redeeming a certain category of bonds, including the 1902 and 1911 Bonds. *Id.* ¶ 21. Pursuant to this and other decrees, any Bonds that had not been pre-

sented for redemption by July 1, 1969, were deemed invalid by Brazil. *Id.* ¶ 22. Accordingly, Mr. Barbosa asserts, not only were the payment obligations at issue extinguished, but also plaintiffs could not be proper owners of the Bonds, because Brazil stopped accepting transfers of ownership once the Bonds were redeemed and the transfer books were closed in 1969. *Id.* ¶ 26–27. Mr. Barbosa denies that Brazil had any role in facilitating plaintiffs' purchase of the Bonds, and notes that speculators in recent years "have purportedly 'acquired' bonds at minimal values, hoping through litigation or otherwise to increase the value of those bonds and profit thereby." *Id.* ¶¶ 24, 31.

Plaintiffs, in response, challenge Brazil's legal arguments in favor of dismissal. They also move to begin discovery, arguing that the Court "should not rule in Brazil's favor on any argument until it provides the Plaintiffs a reasonable opportunity for appropriate discovery to challenge the factual assertions Brazil advanced to justify its Motion." Pls.' Opp. at 1.

■ Upon consideration of the parties' submissions, and the hearing on May 30, 2002, the Court concludes that the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602, et seq., is a bar to jurisdiction here. Plaintiffs have failed to identify factual issues requiring discovery at this time, and even if they did, the Court would dismiss this case under the principles of forum non conveniens rather than subject Brazil to intrusions upon its apparent immunity.[1]

---

**1.** Because the Court believes that the FSIA and the principles of forum non conveniens provide sufficient grounds for dismissal, the Court will not consider the other bases for dismissal raised by Brazil.

In considering defendant's motion to dismiss under the FSIA, "the court must go beyond the pleadings and resolve any disputed issue of fact the resolution of which is

necessary to a ruling upon the motion to dismiss." *Phoenix Consulting v. Republic of Angola,* 216 F.3d 36, 40 (D.C.Cir.2000); *see also Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1027–28 (D.C.Cir. 1997) ("Where the motion to dismiss is based on a claim of foreign sovereign immunity, which provides protection from suit and not merely a legal defense to liability, ... the

## ANALYSIS

### I. Lack of Subject Matter Jurisdiction Under the FSIA

Section 1604 of the FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." Section 1605(a)(2), in turn, specifies that immunity does not apply in any case:

> in which the action is based upon [1] a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

Brazil moves to dismiss the complaint on the basis that Brazil is immune from suit and that none of the "commercial activity" exceptions in § 1605(a)(2), or any other exceptions to immunity, apply to plaintiffs' action.[2] Plaintiffs, in turn, contend that both the first and third clauses of § 1605(a)(2) are implicated by the complaint.

### A. The First Clause of § 1605(a)(2)

Under the first clause of § 1605(a)(2), a sovereign is not entitled to immunity when the "action is based upon a commercial activity carried on in the United States by the foreign state." Plaintiffs offer a rather complex theory for why this exception applies here. As a starting point, they argue that Brazil currently offers and sells "Global bonds" through primary markets in the United States. In addition, they argue, there are secondary markets for various Brazilian securities, including the 1902 and 1911 Bonds, in the United States. According to plaintiffs, the "secondary markets and the primary markets are linked as one commercial activity" because "[s]econdary markets are essential to the proper functioning of the primary markets for foreign sovereign debtors." Pls.' Opp. at 17. The existence of a smoothly functioning secondary market for one security, plaintiffs argue, leads to better primary and secondary markets for a sovereign's other securities, with higher trading prices, because investors have confidence that they will be able to resell any securities that they purchase. Based on this logic, plaintiffs speculate that, in an effort to promote sales of its "Global bonds" and other securities, Brazil fostered the secondary markets for the 1902 and 1911

---

court must engage in sufficient factual and legal determinations to satisfy itself of its authority to hear the case before trial." (internal quotations omitted)); *Guzel v. State of Kuwait*, 818 F.Supp. 6, 9 (D.D.C.1993) (in making a determination whether to dismiss for lack of jurisdiction, " 'a district court may consider conflicting evidence—contained in affidavits, for example—and make its own resolution of disputed jurisdictional facts.' ") (quoting *Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285, 289 n. 6 (5th Cir.1989)). It is likewise appropriate for the Court to consider declarations and other factual materials in the context of defendant's motion to dismiss under the principles of forum non conveniens. *See Overseas Partners, Inc. v. PROGEN Musavirlik*

*ve Yonetim Hizmetleri, Ltd. Sikerti*, 15 F.Supp.2d 47, 49 n. 1 (D.D.C.1998) (noting that court's consideration of affidavits submitted by the parties on a motion to dismiss on forum non conveniens grounds does not convert the motion into one for summary judgment).

**2.** Brazil also argues that it is immune from suit because it issued the Bonds in 1902 and 1911, before the FSIA was enacted and while the United States had a policy of absolute immunity for foreign sovereigns. Because the Court finds that even if the FSIA does apply Brazil is immune from suit, it need not consider the parties' arguments concerning retroactivity.

Bonds in the United States (where the plaintiffs allegedly purchased some of their Bonds). Accordingly, plaintiffs argue, Brazil engaged in the "commercial activity of issuing securities and promoting secondary markets for its securities to and by persons in the United States." *Id.* at 19–20.

Plaintiffs' theory, although creative, is ultimately unpersuasive. Even if Brazil knew that there was a secondary market for the Bonds in the United States, and even if Brazil fostered that market, plaintiffs' action is not "based upon" that conduct, as required by the language of the first clause of § 1605(a)(2). The Supreme Court explained in *Saudi Arabia v. Nelson*, 507 U.S. 349, 357, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993), that the phrase "based upon" in § 1605(a)(2) means "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." "Based upon" thus "calls for something more than a mere connection with, or relation to, commercial activity." *Id.* at 358, 113 S.Ct. 1471 (emphasis omitted).

█ The claim stated in plaintiffs' complaint is a straight-forward breach of contract claim for non-payment. It is "based upon" Brazil's failure to pay the principal and interest on the Bonds. Although plaintiffs allege in their complaint that Brazil knows of U.S. secondary markets for the Bonds, the complaint is certainly not "based upon" Brazil's purported promotion of these markets. Even if proven, then, the allegation that Brazil fostered secondary markets would not "entitle ... plaintiff[s] to relief under [their] theory of the case." *Id.* at 357, 113 S.Ct. 1471. To the contrary, the secondary market allegations "are legally irrelevant to [plaintiffs'] right of recovery." *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1146 (D.C.Cir.1994)

█ Plaintiffs attempt to bolster their position by alleging that "Brazil had a contractual duty under Brazilian law to make reasonable efforts to inform traders in the United States that Brazil's position was that it viewed the Bonds as redeemed and invalid and that it had no intention of making further payments under the Bonds." Pls.' Opp. at 20. In support of this allegation, plaintiffs submit a declaration from a Brazilian law professor who opines that, under Brazilian law, Brazil has a duty when it issues securities to inform the financial markets of any relevant fact which could reasonably affect the investors' decision to sell or buy the securities. Declaration of Hermes Marcelo Huck ¶ 9. This duty, as well as the "duty to make only truthful representations to other parties," are related to the general duty of "'good faith' ... applicable to all legal obligations [under Brazilian law], including contracts between ... the Government and its citizens and companies." *Id.* ¶¶ 5, 7, 10. According to plaintiffs' legal expert, then, Brazil violated these duties because it failed to inform investors adequately: 1) that the public works financed by the Bonds had been completed; 2) that Brazil redeemed the Bonds in 1967; and 3) that Brazil considered the Bonds valueless. *See id.* ¶¶ 12–14.

Plaintiffs' theory is insufficient to support jurisdiction here. The only claim brought by plaintiffs is for "Breach of Contract" and the only contractual breach identified in the complaint is Brazil's failure to pay principal and interest. As the complaint states:

> Brazil has not made any interest payments or repayments of the principal to the Plaintiffs. These failures breached Brazil's contractual obligation to repay the Plaintiffs Croesus, Polaris, and Select Capital as bearers of the Bonds.

Compl. at p. 7 and ¶ 30. The complaint does not purport to set forth a claim for fraud or misrepresentation, nor does it even suggest that Brazil has violated any duty of "good faith" under Brazilian law or any related duties to inform investors or make truthful representations.

In fact, the only allegations in the complaint even alluding to representations made by Brazil about the Bonds are: 1) that "[o]n at least two occasions, once in 1967 and once in 1995, Brazil reaffirmed the validity of the 1902 Bonds and the 1911 Bonds notwithstanding that the relevant infrastructure projects were not completed"; and 2) that "[n]otwithstanding earlier actions to reaffirm the validity of the Bonds, Brazil refused to pay the bondholders after presentment and has publicly stated that it will not pay the 1902 Bonds or the 1911 Bonds." *Id.* ¶¶ 23–24. The context of the complaint makes clear that the purpose of these allegations is not to support a cause of action for fraud, misrepresentation or breach of any duty of good faith, but rather to support plaintiffs' assertions that the Bonds are valid and that presentment by plaintiffs would be futile. *See id.* Thus, even liberally construed, the complaint fails to indicate that plaintiffs are attempting to state a claim "based upon" any misrepresentations or omissions about the validity of the Bonds. *See Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

Accordingly, on these facts and allegations, there is no exception to immunity under the first clause of § 1605(a)(2). *See Nelson,* 507 U.S. at 357, 113 S.Ct. 1471.[3] Moreover, because plaintiffs' theories concerning secondary markets and alleged failures to inform investors are legally irrelevant, there is no need for discovery on those issues.

**B. The Third Clause of § 1605(a)(2)**

The third clause of § 1605(a)(2) provides an exception to immunity where a case is "based upon ... an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." Plaintiffs identify two "acts" by Brazil allegedly fitting within this clause—Brazil's alleged failure to "keep market participants informed of actions affecting the value of the [B]onds" and Brazil's failure to repay the principal and interest on the Bonds. Pls.' Opp at 22.

The first alleged act cannot provide a basis for an exception. As discussed above, plaintiffs' action is not "based upon" an alleged failure to inform market participants.

■ The second alleged act, the nonpayment of principal and interest, is the basis for plaintiff's claim. The relevant question therefore is whether the non-payment had a "direct effect" in the United States. According to plaintiffs, a "direct effect" occurred because plaintiffs (two of whom are U.S. entities, and all of whom have U.S. investors) did not receive payments into their U.S. bank accounts. The Court disagrees.

In this context, the Supreme Court has held that an effect is direct if it follows as an "immediate consequence" of a defendant's activity. *Republic of Argentina v. Weltover,* 504 U.S. 607, 618, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). As further explained by the D.C. Circuit, an effect is

---

**3.** Because the Court finds that plaintiffs' case is not "based upon" any allegation of misrepresentation or omission, the Court need not reach the question whether such alleged conduct can constitute a "commercial activity" under § 1605(a)(2).

direct if it " 'has no intervening element, but rather, flows in a straight line without deviation or interruption.' " *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1172 (D.C.Cir.1994) (quoting *Upton v. Empire of Iran*, 459 F.Supp. 264, 266 (D.D.C.1978)).

It is clear enough that non-payment of funds into a U.S. bank can constitute a "direct effect." In *Weltover*, for example, the Supreme Court found that, where a party had designated accounts in New York as the place of payment on interest payments owed by Argentina, Argentina's failure to pay satisfied the "direct effect" standard:

> Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a "direct effect" in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming.

504 U.S. at 619, 112 S.Ct. 2160 (1992).

But in *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143 (D.C.Cir.1994), the D.C. Circuit clarified that a "direct effect" in the United States occurs only where payment was "supposed" to have been made or received in the United States:

> The situation here is quite different [than in *Weltover*]. There has been no " 'immediate consequence' " in the United States of Rafidain's failure to honor the letters [of credit]. Neither New York nor any other United States location was designated as the "place of performance" where money was "supposed" to have been paid by Rafidain or to Goodman. Rafidain might well have paid them from funds in United States banks but it might just as well have done so from accounts located outside of

the United States, as it had apparently done before. Thus, Rafidain does not lose its immunity under the direct effect exception.

*Id.* at 1146–47.

Here, the parties disagree on whether payment was ever "supposed" to have been made in the United States. It is undisputed that up through the 1960s, payments were made at "empowered branch[es]," none of which was located in the United States, and that, under the terms of the Bonds, a bondholder had no right to designate a place of payment in the United States. *See* Declaration of Luis Roberto Barroso ¶¶ 8, 12–14, 22; Supplemental Declaration of Luis Roberto Barroso ¶ 4; Huck Decl. ¶ 18–19.[4] But plaintiffs contend that because Brazil's Public Debt Office (which formerly served as an "empowered branch" for payment) no longer exists, "the creditor has the right to choose between any of the existent systems of payment that today Brazil utilizes to pay interest in its debt securities." Huck Decl. ¶¶ 19, 22. Because Brazil currently uses agents in the United States for payments on some of its other financial obligations, plaintiffs argue, "Brazil likely would have honored a designation by the Plaintiffs of a place in the United States as the place of payment." Pls.' Opp. at 24; *see also* Huck Decl. ¶ 20.

Plaintiffs' argument fails. First, plaintiffs do no more than speculate that Brazil would "likely" have honored a designation of the United States as the place of payment. Second, plaintiffs never did designate the United States as the place of payment. Instead, they determined that presentment of the Bonds for payment would be futile and they proceeded to file this lawsuit. Thus the Court is left with

4. Plaintiffs' legal expert contends that "empowered branches" were located not only in Brazil, but also in London, Paris, and Lisbon. Huck Decl. ¶ 18. Brazil's expert maintains that payment outside of Brazil was never permitted. Supp. Barroso Decl. ¶ 4.

mere conjecture—that if plaintiffs had presented the Bonds for payment, they would have designated the United States as the place for payment, and that, under a hypothetical Brazilian regime that recognized the validity of the Bonds (which were formerly payable only in Brazil), Brazil would "likely" agree to plaintiffs' designation. This scenario is too full of contingencies to support the conclusion that payment was "supposed" to have been made in the United States. The non-payment could have had no "immediate consequences"—and thus no "direct effect"—in the United States where there was never any designation of a place in the United States where payment was to be received, much less any firm basis to believe that such a designation would have been accepted by Brazil and proper as a matter of Brazilian law.[5]

Accordingly, plaintiffs cannot identify a "direct effect" in the United States and there is no exception to immunity under the third clause of § 1605(a)(2). Moreover, plaintiffs are not entitled to discovery on the issue of "direct effect," as plaintiffs present no facts suggesting that Brazil has recently made payments in the United States on the 1902 or 1911 Bonds.

---

**5.** It is not clear whether plaintiffs are arguing that a "direct effect" in the United States occurred merely by virtue of the fact that U.S. entities allegedly suffered losses resulting from Brazil's non-payment. Plaintiffs have not identified any precedent in this Circuit supporting such a position, and the Court sees no basis for extending the meaning of "direct effect" that far. Indeed, loss to a U.S. plaintiff would not necessarily constitute "direct effect" even under the expansive approach of the Fifth Circuit that plaintiffs ask the Court to employ here. *See Voest–Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 896 n. 11 (5th Cir.1998) (declining to reach question as to whether "any financial loss suffered by an American plaintiff, regardless of where that loss was incurred, is alone sufficient to constitute a direct effect under the third clause").

## II. Forum Non Conveniens

■ The Court therefore concludes that there are no grounds for an exception to immunity under any clause in § 1605(a)(2), and that discovery is not necessary before making a determination on that issue. Hence, the complaint must be dismissed on that basis. Even if there were grounds for discovery, however, the Court would dismiss the complaint at this time. Under controlling precedent in this Circuit, jurisdictional discovery on FSIA issues "should not be authorized at all if the defendant raises either a different jurisdictional or an 'other non-merits ground[ ] such as form non conveniens [or] personal jurisdiction' the resolution of which would impose a lesser burden on the defendant." *Phoenix Consulting v. Republic of Angola*, 216 F.3d at 40 (quoting *In re Papandreou*, 139 F.3d 247, 254–55 (D.C.Cir.1998)). Here, the Court finds that there are compelling grounds for dismissal under the doctrine of forum non conveniens.[6]

The Court must follow a four-step inquiry in analyzing a motion to dismiss on the basis of forum non conveniens:

As a prerequisite, the court must establish whether an adequate alternative fo-

---

**6.** Plaintiffs argue that a court may not dismiss a case under the FSIA on the basis of forum non conveniens. But the cases cited by plaintiffs for this proposition involve the state sponsored terrorism exception to the FSIA, which does not apply here. *See, e.g., Daliberti v. Republic of Iraq*, 97 F.Supp.2d 38, 54 n. 7 (D.D.C.2000); *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 25 (D.D.C.1998). Moreover, *Phoenix Consulting*, 216 F.3d at 40, and *In re Papandreou*, 139 F.3d at 254–55, clearly permit courts to consider forum non conveniens as a basis for dismissal where the FSIA applies. *See also Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 490 n. 15, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) (the FSIA "does not appear to affect the traditional doctrine of forum non conveniens").

rum exists which possesses jurisdiction over the whole case. Next, the trial judge must consider all relevant factors of private interest, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice. If the trial judge finds this balance of private interests to be in equipoise or near equipoise, he must then determine whether or not factors of public interest tip the balance in favor of a trial in a foreign forum. If he decides that the balance favors such a foreign forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice.

*Pain v. United Techs. Corp.,* 637 F.2d 775, 784–85 (D.C.Cir.1980).

■ With respect to the first step of the inquiry, Brazil offers evidence from its legal expert that Brazil would be an adequate forum for this litigation. According to Brazil, Brazilian courts have jurisdiction over cases such as this, which arise out of obligations to be performed in Brazil or events occurring in Brazil. Barroso Decl. ¶ 5. In addition, Brazil would be unable to claim sovereign immunity in its own courts. *Id.* ¶ 6.

Plaintiffs, in response, do not argue that, as a legal matter, the courts of Brazil would not hear their claim.[7] Instead, they contend that they "strongly prefer this venue and desire the fairness and reliabili-

ty of a U.S. federal court over the uncertain treatment they would receive in a Brazilian court in a case against the Brazilian government." Pls.' Opp. at 32. However, plaintiffs have offered no evidence whatsoever that they would be treated unfairly in a Brazilian court, and the Court cannot base its decision on plaintiffs' speculation.[8] Accordingly, the Court finds that the prerequisite for forum non conveniens, an alternate forum, has been satisfied.[9]

The second step of the inquiry requires the Court to consider the presumption against disturbing plaintiffs' initial forum choice in light of factors such as the relative ease of access to sources of proof, the availability of compulsory process for attendance of unwilling witnesses, the cost of obtaining attendance of willing witnesses, and "all other practical problems that make trial of a case easy, expeditious, and inexpensive." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). The presumption in favor of a plaintiff's choice of a forum is substantial, indeed. *See Pain,* 637 F.2d at 784 (moving party "bear[s] a heavy burden of establishing that plaintiffs' choice of forum is inappropriate"). Here, however, there are substantial reasons for favoring Brazil as the forum. Assuming that this case continues in the United States based on the present complaint and the defenses that Brazil will apparently be asserting, this litigation will center around an analy-

7. Counsel for plaintiffs suggested during a hearing before this Court that Brazilian courts may require that at least one plaintiff in a case be a citizen of Brazil. But plaintiffs' counsel was not certain if this was true and plaintiffs offered no evidence to this effect. In any event, such a requirement would probably not make Brazil an inadequate forum, as it appears that there are numerous potential plaintiffs in Brazil.

8. At the hearing in this matter, plaintiffs indicated that they require discovery concerning how foreign plaintiffs have been treated in

Brazil. The Court does not believe that this is an appropriate issue for exploration through discovery. If plaintiff had evidence—through judicial decisions, legal experts or otherwise—of the mistreatment of foreign plaintiffs in Brazilian courts, they could have offered it.

9. Of note, plaintiffs do not contend that pretrial or trial procedures in Brazil are inadequate. *Cf. Manela v. Garantia Banking Ltd.,* 940 F.Supp. 584, 590–91 (S.D.N.Y.1996) (rejecting plaintiff's argument that alleged procedural deficiencies in Brazil made it an inadequate forum).

sis of Brazilian legal issues. Accordingly, the parties will have to obtain testimony from Brazilian law experts and from members of the Brazilian government, most of whom are likely to live in Brazil. Moreover, to the extent that the parties require testimony from former members of the Brazilian government, these witnesses, too, are likely to reside in Brazil, outside the reach of compulsory process. The parties will also have to examine documents of the Brazilian government, which are located in Brazil.[10] In addition, for the purposes of motion practice and trial, documents from the Brazilian government, as well as the testimony of various Brazilian legal experts and fact witnesses, will have to be translated into English. The Court notes that in briefing the instant motion, the parties not only obtained opinions from Brazilian legal experts, but also translated an abundance of materials from Portugese into English.

It may well be the case that plaintiffs' representatives as well as the evidence of their purchases of the Bonds are located in the United States. But the fact that plaintiffs acquired the Bond certificates is

unlikely to require extensive proof.[11] In addition, it is not the fact of plaintiffs' purchases, but their legal significance, as well as the legality and effect of actions by the Brazilian government, that are at the heart of this case, as framed by the parties thus far. Litigating a case on these grounds will require a heavy emphasis on Brazilian sources of proof (and law), and thus seems likely to be expensive, cumbersome and time-consuming if conducted here.[12] Accordingly, even taking into account the presumption favoring plaintiffs' choice of forum (and plaintiffs' concern about "uncertain treatment" in Brazil's courts), the private interests here are "in equipoise or near equipoise." *Pain*, 637 F.2d at 784.

The third group of factors, the "public interest factors," weighs heavily in favor of a Brazilian forum and hence dismissal of this action. Under *Pain*, the Court should consider the burden on the community in light of the connection between the event in dispute and the chosen forum, the local public interest in the dispute, and the court's familiarity with the applicable law. *See id.* at 791–92.[13]

---

**10.** To the extent that there are relevant third party documents located in Brazil, recourse to letters rogatory will be necessary. Brazil's legal expert asserts that Brazil's courts would likely refuse such requests, as well as requests for third-party depositions in Brazil, because they would not recognize a United States court's jurisdiction over this case. Barroso Decl. ¶ 8.

**11.** Moreover, to the extent that plaintiffs allege that witnesses concerning Brazil's participation in U.S. securities markets are located in the United States, the Court again notes that allegations concerning Brazil's participation in U.S. securities markets are legally irrelevant to the claim stated in plaintiffs' complaint. *See* discussion in Part I *supra*.

**12.** Another private interest factor that may be considered by the Court is the enforceability of any judgment obtained in the United States. *See Gilbert*, 330 U.S. at 508, 67 S.Ct. 839. Brazil's legal expert concludes that Bra-

zil's courts would probably not enforce a judgment obtained here because they would not recognize a United States court's jurisdiction over this case. Barroso Decl. ¶ 8. Plaintiffs counter that they would likely be able to enforce a judgment in the United States by seizing proceeds from Brazil's issuance of securities in the United States. Pls.' Opp. at 35. The Court need not reach this issue, as it is clear from a consideration of the other private interest factors that the presumption in favor of plaintiff's choice of forum has been overcome.

**13.** Plaintiffs also urge the court to consider in its analysis the congestion in the Brazilian courts. However, plaintiffs have provided the Court with insufficient information to make a meaningful assessment of the relative congestion of Brazilian and United States courts or the risk that Brazilian courts might delay indefinitely a politically sensitive case such as this. *See* Pls.' Opp. at 36 & n. 108. More-

■ As an initial matter, because claims under the FSIA are not eligible for resolution by a jury, there is no particular burden on the community imposed by the litigation here. *See* 28 U.S.C. § 1330(a); *Universal Consol. Cos., Inc. v. Bank of China*, 35 F.3d 243, 244–45 (6th Cir.1994) ("While the language of § 1330 might have stated the rule more clearly, ... all federal appellate courts which have considered the issue—including the Second, Third, Fourth, Fifth, and Eleventh Circuits— have held that jury trials are not available in suits brought under the [FSIA].").

With respect to the second consideration, local interest, there no reason to believe that the District of Columbia or its citizens has an interest in having this litigation occur here. None of the events in question occurred in the District of Columbia and none of the parties claims to have any connection to the District. Indeed, there is a "striking ... lack of any significant contacts between the event in dispute and the forum chosen· by the plaintiffs." *Pain*, 637 F.2d at 792.

The conclusion is the same with respect to national, as opposed to local, interest. There is no allegation that fundamental issues of American policy are implicated by this lawsuit, or that the U.S. government played any role in the events at issue. *Cf. Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 717 F.2d 602, 609 (D.C.Cir.1983) ("local American interest" favored retaining litigation in the United States where evacuation operation in South Vietnam was "entirely an American operation ... organized by Americans, and ... employ[ing] American military equipment and personnel."). And although the American plaintiffs here may have suffered losses,· and some of the Bonds at issue may have been purchased in the United States, the Bonds are internal debt obligations of Brazil, and were not issued by Brazil with an intent to be sold abroad to U.S. investors in U.S. markets. *See* Barroso Decl. ¶ 3 n. 3; Supp. Barroso Decl. ¶ 7. Accordingly, any argument that there is a generalized national interest in protecting U.S. citizens from contractual breaches or in policing securities markets is not particularly compelling here.

The marginal nature of the United States' interest stands in stark contrast to the magnitude of Brazil's interest. *Compare Pain*, 637 F.2d at 793 (dismissing case where Norway was the "most interested forum"). The plaintiffs' allegations of non-payment implicate the fiscal structure and monetary policy of Brazil, not to mention the propriety of the actions of its government officials. Indeed, plaintiffs seek over $140,000,000 from the government, and hence the people, of Brazil in this action alone. Accordingly, an adjudication by this Court on the validity of the bonds may have significant reverberations for Brazil's government and economy. *See* Barroso Decl. ¶ 13; Supp. Barroso Decl. ¶ 18. Moreover, there are numerous lawsuits currently pending in Brazil in which other plaintiffs are challenging Brazil's position concerning the validity of the Bonds. *See* Barroso Decl. ¶ 9–10, 14; Supp. Barroso Decl. ¶ 17 & n. 10; · Barbosa Decl. ¶ 31 & n. 10. The existence of these other lawsuits not only attests to the interest of the Brazilian people in the issues at stake here, but also counsels in favor of adjudication of this case in Brazil's domestic courts so as to avoid inconsistent results.

The Court's lack of familiarity with the governing substantive law also weighs in favor of dismissal. As plaintiffs concede, this controversy will likely be governed by

---

over, at least one court has rejected the contention that delays in the Brazilian courts make it an inadequate alternate forum. *See*

*Manela*, 940 F.Supp. at 591 n. 11. Accordingly, the Court cannot afford great weight to plaintiffs' arguments on this issue.

Brazilian law. Pls.' Opp. at 36. If the litigation continues here, the Court will have to consider numerous complex issues of Brazilian law, including: whether Brazil may unilaterally force the redemption or exchange of the Bonds after their issuance; whether the 1967 decree is unconstitutional; the extent of Brazil's duty to publish its redemption calls; the effect of a 1995 provisional measure implicitly referring to the Bonds; whether plaintiffs could have obtained valid title to the Bonds without entering their names in the registration books; and whether the statute of limitations on plaintiffs' claim has run. *See* Barroso Decl. ¶ 18; Pls.' Opp at 3–4; Huck Decl. ¶¶ 25–26. Many of these legal issues are apparently unsettled, or at least hotly contested, as evidenced by the competing affidavits from Brazilian legal experts that have been submitted in the context of the instant motion. Indeed, there is apparently even some split among the Brazilian courts that have thus far considered similar issues in the related cases. *See* Supp. Barroso Decl. ¶ 17; Pls.' Opp. at 4. It is worth noting, moreover, that the Court's analysis of foreign law issues will be impeded by its inability to work directly from the original Portuguese-language Brazilian legal sources.[14] These various considerations, of course, strongly suggest that Brazil is a more appropriate forum for this dispute. *See Gilbert,* 330 U.S. at 509, 67 S.Ct. 839 (appropriate to favor trial in "forum that is at home with the ... law that must govern the case, rather than having a court in some other forum untangle problems ... in laws foreign to itself"); *Pain,* 637 F.2d at 793 (dismissing case where foreign law would likely govern resolution of the substantive dispute in the case).

In sum, upon consideration of the public interest factors in the overall balance, the Court finds that there are compelling grounds for dismissal on the basis of forum non conveniens. This litigation will require significant reliance upon Brazilian sources of proof and will turn upon unsettled issues of Brazilian law that are currently winding their way through Brazilian courts in several similar cases. The United States has minimal interests in this litigation other than its general interest in policing its financial markets; in contrast, the case implicates issues of substantial concern and consequence for Brazil and its citizens. Accordingly, after conducting the first three steps of its inquiry, the Court concludes that the circumstances warrant dismissal in this case. The Court must therefore proceed to the final inquiry: whether plaintiffs can reinstate their suit in Brazil without undue inconvenience or prejudice.

Plaintiffs make no serious argument that they could not reinstate this litigation in Brazil. Plaintiffs are not indigent claimants without the means to assert their claims abroad; they are sophisticated hedge funds with sufficient resources to trade in foreign debt instruments. Although they claim that litigation in Brazil will be more expensive and less convenient, they have not argued that cost or inconvenience presents a serious bar to proceeding in Brazil. Moreover, plaintiffs have not identified any way in which they might be prejudiced by litigation in Brazil (other than their speculation that they will not receive fair consideration in Brazil's courts). Notably, this case is at a relatively early stage. Accordingly, the Court concludes that dismissal on the basis of forum non conveniens is appropriate.

---

14. The courts of Brazil may also have institutional knowledge of the relevant legal issues that is lacking here. *See Friends for All Children,* 717 F.2d at 609 (favoring retention of case in the District of Columbia where its courts "have already done a great amount of work on ... closely-related cases").

**42**

## CONCLUSION

Brazil is entitled to immunity from suit on plaintiffs' complaint under the FSIA, as there is no basis for finding that an exception to immunity applies under 28 U.S.C. § 1605(a)(2). The Court does not believe that discovery is necessary before resolving the issues under the FSIA, but in any event, the Court finds that the doctrine of forum non conveniens provides an alternate basis for dismissal in favor of a Brazilian forum. Accordingly, under either the FSIA or the doctrine of non conveniens, plaintiffs' complaint should be dismissed.

A separate order has been issued on this date.

## *ORDER*

Upon consideration of Defendant's Motion to Dismiss, Plaintiffs' Motion to Begin Discovery, the submissions of the parties, the hearing on May 30, 2002, and the entire record, it is hereby

ORDERED that Plaintiffs' Motion to Begin Discovery is DENIED for the reasons stated in the Memorandum Opinion issued on this date; and it is further

ORDERED that Defendant's Motion to Dismiss is GRANTED for the reasons stated in the Memorandum Opinion issued on this date, and the complaint is hereby dismissed in its entirety.