ATLANTIC TELE–NETWORK
INC., Plaintiff

v.

INTER–AMERICAN DEVELOPMENT
BANK, et al., Defendants.

No. 02–1261 (TPJ).

United States District Court,
District of Columbia.

March 7, 2003.

As Corrected March 13, 2003.

Randall Woods Sifers, Kelley Drye & Warren, LLP, Washington, DC, Andrew P. Gaillard, Day, Berry & Howard, Stamford, CT, Paul L. Kattas, Joseph A. Boyle, Kelley Drye & Warren, LLP, Parsipanny, NJ, for Atlantic Tele-Network, Inc.

William Dill Rogers, Nancy L. Perkins, Mara V.J. Senn, Nick Malhotra, Arnold & Porter, Washington, DC, for Inter-American Development Bank.

Roscoe Conklin Howard Jr., Michael C. Johnson, U.S. Attorneys Office, Washington, DC, for Jose A. Fourquet.

Michael C. Johnson, U.S. Attorneys Office, Washington, DC, Paul Stuart Reichler, Foley, Hoag, LLP, Washington, DC, for Paul O'Neill.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

According to the original verified complaint of plaintiff Atlantic Tele-Network, Inc., ("ATN"), the defendant Republic of Guyana contracted with ATN, an American corporation, in June, 1990, to build a domestic telecommunications system for the country. The system, once built, was to be owned by a private Guyanese limited liability company to be known as the Guyana Telephone and Telegraph Company, Ltd. ("GT & T"). ATN would purchase 80 percent of GT & T's capital stock, the remainder to be owned by the government of Guyana, and GT & T would receive an exclusive license from the government of Guyana to operate the system for 20 years, renewable at GT & T's option for a similar term. ATN was also promised, it says, a 15 percent return on its capital investment.[1]

Pursuant to the contract, ATN alleges, it completed construction of a modern digital telecommunications system in Guyana at a cost of $140 million. By 1997, however, it became apparent that GT & T's rate of return on its investment was less than the 15 percent it had been guaranteed, but the government of Guyana blocked all efforts to obtain a rate increase sufficient to make up the difference. By May, 2001, ATN alleges, it discovered that the government of Guyana was planning to build a competing telecommunications system in violation of GT & T's contractual right to an exclusive license for 20 years, proposing to use for this purpose moneys to be borrowed from the defendant Inter-American Development Bank ("IDB").

ATN commenced this action on June 20, 2002, against IDB and the two officials of the U.S. government who exercise control over IDB's lending activities, its U.S. Executive Director and the U.S. Secretary of the Treasury (hereinafter the "federal defendants"). Of immediate concern to ATN was what it believed to be the imminent approval of a loan by IDB to Guyana of approximately $18 million to $20 million to begin construction of the competing telecommunications system. ATN sought a temporary restraining order and a preliminary and permanent injunction against the loan, as well as a writ of *mandamus* directing the federal officials to prohibit any use of IDB funds for the benefit of Guyana. The basis for the relief sought was alleged to be two federal statutes, the Inter-American Development Bank Act, 22 U.S.C. §§ 283 *et seq.*, and the Foreign Assistance Act of 1961, 22 U.S.C. §§ 2151 *et seq.*

Following denial of ATN's application for preliminary injunctive relief, ATN filed its first amended verified complaint, adding the Republic of Guyana as a party-defendant to a count alleging breach of

---

1. A subsequent amended verified complaint alleges that the contract closing took place in New York in January, 1991.

contract. Jurisdiction of the claim against Guyana is asserted to be found in the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.*

The federal defendants, IDB, and Guyana have each filed separate motions to dismiss the amended complaint upon grounds peculiar to each. The Court will grant each of the motions for the reasons explained below.

### I.

*The Federal Defendants' Motion to Dismiss*

The federal defendants offer four interrelated reasons why the complaint must be dismissed as to them. They contend ATN lacks the requisite constitutional standing to maintain its claims against them. The issue of standing aside, they say, the statutes pursuant to which ATN sues do not admit of enforcement by private lawsuit, and even if they did the right to relief would involve non-justiciable political issues. Finally, the foregoing uncertainties preclude any relief by way of a writ of *mandamus.*

■ Plaintiff ATN's standing *vis-a-vis* the federal defendants is dubious at best. Article III standing always requires the existence of an injury in fact suffered by the plaintiff, a causal connection between the injury and the conduct complained of, and a likelihood that the injury will be "redressed by a favorable decision" by the court. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). While there may be some relationship between the IDB's impending loan to Guyana and the injury of which ATN complains, it is clearly not one

of cause-and-effect the federal defendants had nothing to do with Guyana's breach of contract nor is it clear to the Court that impeding the IDB loan would in any way induce Guyana to comply with the contract.

Two District of Columbia cases addressed a like issue, and in neither of them was the plaintiff found to have the requisite standing. In *Talenti v. Clinton,* 102 F.3d 573 (D.C.Cir.1996), after failing to receive compensation from the Italian government for its expropriation of his real property in Italy, the plaintiff sought to enjoin U.S. foreign aid to the Italian government. The D.C. Circuit held that it would be "mere speculation to assume that a judgment in Talenti's favor would at all ameliorate Talenti's injury." *Talenti,* 102 F.3d at 577. Similarly, in *Aerotrade Inc. v. Agency for International Development, Dep't of State,* 387 F.Supp. 974 (D.D.C. 1974), this district court found no standing for a plaintiff seeking to collect moneys allegedly owed it by Haiti for a sale of arms, observing that "plaintiff's notion...that a suspension of all aid to Haiti would necessarily have the effect of putting pressure on Haiti to come to terms with it" actually gave rise to "considerable uncertainty as to whether such action would aid plaintiff in collecting its debt or would tend to drive Haiti into even greater intransigence." *Aerotrade,* 387 F.Supp. at 975.[2]

■ ATN attempts to distinguish *Talenti* and *Aerotrade,* on the grounds that the plaintiffs in those cases sought the end of all foreign aid to a defendant nation, whereas ATN seeks only the denial of a single specific loan. The distinction is

---

2. *See also Betteroads Asphalt v. United States,* 106 F.Supp.2d 262, 267 (D.P.R.2000) (no standing for plaintiff seeking payment for paving the airport in the Dominican Republic because "the possibility that Plaintiff would

recover its debt from the Government of the Dominican Republic if the United States withheld foreign assistance is too speculative to support standing").

hardly helpful. What is to stop Guyana from borrowing money for the same purpose elsewhere, or from simply funding the competing telecommunications system project itself? Perceiving little likelihood that ATN's injury will be "redressed by a favorable decision," granting the relief sought against the federal defendants, *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130, the Court holds that ATN lacks standing to bring the instant action against them.

ATN claims to be entitled to relief against the federal defendants under two different federal statutes. Count One of its complaint invokes a provision of the Inter–American Development Bank Act, 22 U.S.C. § 283r, (known colloquially as "the Gonzalez Amendment"), and Count Two, a counterpart found in the Foreign Assistance Act, 22 U.S.C. § 2370a(a), ("the Helms Amendment"). Both represent amendments to substantive statutes dealing with foreign economic assistance and purport to instruct the President and his subordinates to act to prevent disbursements to foreign nations that have expropriated the property of United States citizens or repudiated or nullified any contract with a United States citizen.[3] The federal defendants assert that neither amendment is enforceable at the instance of a private litigant.

■ The U.S. Supreme Court has stated that "[t]he question whether a statute creates a [private] cause of action, either expressly or by implication, is basically a matter of statutory construction." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). But, in the absence of explicit language to that effect, the fact that various private constituencies were intended beneficiaries of legislation does not determine whether its provisions are enforceable by private litigation. *Id.* at 18, 100 S.Ct. 242. Elsewhere the Supreme Court has said that there is "far less reason to infer a private remedy in favor of individual persons where Congress, rather than drafting the legislation with an unmistakable focus on the benefitted class, instead has framed the statute simply as a general prohibition or a command to a federal agency." *Universities Research Association, Inc. v. Coutu*, 450 U.S. 754, 772, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981).

Whether or not the Helms Amendment has superseded the Gonzalez Amendment, *see* n. 3, neither contains anything approaching explicit language authorizing private litigants to invoke them for purposes of private debt collection or contract enforcement, and indeed, as the Seventh Circuit Court of Appeals has noted, "[i]t would be imprudent for a court to create rights of action that might interfere with the conduct of foreign policy." *Israel Aircraft Industries Ltd. v. Sanwa Business Credit Corp.*, 16 F.3d 198, 202 (7th Cir. 1994).[4]

---

**3.** The "Gonzalez Amendment" purports to be unequivocal, while the "Helms Amendment" provides for an "executive waiver" of its prohibition of loans to defaulting foreign nations. In *Betteroads Asphalt, supra* n. 2, the court held that the latter amendment superseded the former, in effect restoring discretion to the Executive Branch to approve or disapprove such loans. The D.C. Circuit similarly found the Hickenlooper Amendment to the Foreign Assistance Act, 22 U.S.C. § 2370(e)(1), a statute analogous to the Gonzalez Amendment, to have been superseded by the Helms Amendment, and applied the Helms Amendment retroactively. *Talenti*, 102 F.3d at 575.

**4.** *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 571, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) ("implying a private right on the basis of congressional silence is a hazardous enterprise, at best"); *see also Aerotrade*, 387 F.Supp. at 976 ("Congress did not intend the courts to intervene to 'enforce' the statute at the instance of a private plaintiff").

■ Further supporting the Court's conclusion that Congress did not intend use of the Gonzalez or Helms Amendments to compel compliance with private contracts with foreign governments is the federal defendants' interrelated third argument, *viz.*, that ATN's complaint raises non-justiciable political questions by attempting to curtail Executive Branch discretion in what is essentially a matter of foreign policy. Foreign aid, including monetary loans for economic development abroad, is an integral component of this country's international relations. To grant or deny a loan to a foreign nation is a decision fraught with foreign policy implications. Congress clearly did not confer the power to make such decisions upon aggrieved private citizens for their personal commercial advantage without regard to the national interest.

■ Finally, the federal defendants move to dismiss on the ground that the plaintiff has failed to satisfy the predicate requirements for a writ of *mandamus*. A writ of *mandamus* demands that the plaintiff prove three things: that the plaintiff has a clear right to relief; that the defendant has a clear duty to act in the premises; and that there is no adequate remedy available to the plaintiff otherwise. *See Swan v. Clinton*, 100 F.3d 973, 977 n. 1 (D.C.Cir.1996) (quoting *American Cetacean Society v. Baldrige*, 768 F.2d 426, 433 (D.C.Cir.1985)). For the reasons previously discussed, the Court finds that the plaintiff has met none of the prerequisites for *mandamus* here. Questions of standing aside, there is no clear right to relief for this plaintiff against these defendants, because there is no private cause of action under the Gonzalez or Helms Amendments. The federal defendants do not have a clear duty to act, because the ultimate decision as to whether to approve the loan under the relevant statutes rests with the President. And, there is an adequate remedy available to ATN, namely, the remedy for which it contracted with Guyana and actually pursues at present in its amended complaint: an action for breach of contract against Guyana in a court of competent jurisdiction.

Finding that the plaintiff lacks standing, has no statutory private cause of action to obstruct a loan by the IDB to a foreign government (even one in default on its contract with a U.S. citizen), and fails to meet the requirements necessary to issuance of a writ of *mandamus*, the Court grants the federal defendants' motion to dismiss on all grounds asserted and will dismiss all claims against the federal defendants.

## II.

### *The IDB's Motion to Dismiss*

The IDB makes two arguments in support of its motion to dismiss. The first is that it possesses the equivalent of sovereign immunity from suit in cases such as this. It also contends that ATN fails to state a claim against it upon which relief can be granted. Finding both that the IDB enjoys immunity from ATN's suit, and that the verified amended complaint does not state a viable claim against the IDB in the circumstances, the Court grants the IDB's motion to dismiss.

The IDB is an international financial institution designated by executive order for protection as an international organization under the International Organizations Immunities Act (IOIA), 22 U.S.C. §§ 288 *et seq.* (1994). *See* Exec. Order No. 10,873, 25 Fed.Reg. 3,097 (1960); Exec. Order No. 11,019, 27 Fed.Reg. 4,145 (1962). The IOIA confers upon the IDB "the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations waive their immunity for the purpose of any proceedings or by

the terms of any contract." 22 U.S.C. § 288a(b).

ATN acknowledges that the IDB enjoys absolute immunity under the IOIA, but argues that it has waived that immunity for cases such as this in the limited waiver of immunity found in Section 3 of Article XI of the IDB Charter. That section provides: "Actions may be brought against the Bank only in a court of competent jurisdiction in the territories of a member in which the Bank has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities." Agreement Establishing The Inter–American Development Bank, April 8, 1959, Art. XI, Section 3.

While some older decisions may have intimated a broader scope to the waiver of immunity represented by Section 3 of Article XI, in *Atkinson v. Inter–American Development Bank*, 156 F.3d 1335 (D.C.Cir. 1998), the D.C. Circuit has most recently adopted an interpretation of the Section 3 waiver effectively narrowing its scope to a minimum. In *Atkinson*, the D.C. Circuit held that "the Bank's immunity should be construed as *not waived* unless the particular type of suit would *further* the Bank's objectives." *Atkinson*, 156 F.3d at 1338 (emphasis in original).

■ As the IDB points out, were this suit to be allowed, virtually any U.S. citizen with a commercial grievance against a debtor nation could challenge an IDB loan to that nation without any "corresponding benefit" accruing thereby to the IDB whatsoever. *Atkinson*, 156 F.3d at 1338. ATN suggests that this suit will aid the IDB in attracting responsible borrowers as well as encouraging American investment in developing nations generally. Both, however, are objectives the IDB can well pursue on its own without help from private litigants. Accordingly, the Court holds that the IDB has not waived its immunity from suits such as this, and is, therefore, immune to this action.[5]

### III.

*Guyana's Motion to Dismiss*

Guyana's motion to dismiss is predicated upon its status as a sovereign nation. Guyana argues this Court lacks subject matter jurisdiction because Guyana has sovereign immunity to suit in the United States which it has not waived either by its contract with ATN or by conduct conforming to any of the express exceptions to the immunity conferred by the FSIA found in the statute itself. *See* 28 U.S.C. § 1602–11. Guyana asserts that the language of Section 16 of its contract with ATN is clear, and that the contract mandates that *any* litigation thereunder (as opposed to arbitration) as to which it *has* relinquished its immunity shall occur only in the courts of Guyana. Guyana also claims that this case must be dismissed under the doctrine

---

**5.** Even if the IDB did not enjoy immunity from this action, the complaint fails to state a claim upon which relief may be granted. Section (a) of the Helms Amendment, 22 U.S.C. § 2370a, the statute under which ATN brings this suit against the IDB, states that "[n]one of the funds made available to carry out this Act, the Foreign Assistance Act of 1961 (22 U.S.C. §§ 2151 *et seq.*), or the Arms Export Control Act (22 U.S.C. §§ 2751 *et seq.*) may be provided to a government or any agency or instrumentality thereof, if the government of such country" expropriated American property, or nullified or repudiated an American contract. 22 U.S.C. § 2370a(a). Since none of the funds the IDB intends to use to make any loan to Guyana come from Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Foreign Assistance Act, or Arms Export Control Act sources, ATN has no cause of action against the IDB under the Helms Amendment. The Court would therefore be obliged to dismiss under Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief may be granted.

of *forum non conveniens.* Finding that Guyana prevails on each of these arguments, the Court grants Guyana's motion to dismiss.

As a foreign state Guyana can, of course, only be sued in the courts of the United States to the extent permitted by the FSIA. Pursuant to the FSIA, Guyana is not immune from suit if it has waived its immunity either expressly or by implication. 28 U.S.C. § 1605(a)(1). ATN claims that Guyana expressly waived sovereign immunity under Section 16 of the contract it signed with ATN. Section 16 of the contract states, in its entirety:

16.1 *Governing Law*—This Agreement shall be construed under and in accordance with the laws of Guyana.

16.2 *Waiver of Sovereign Immunity*— The Government agrees to waive any defense of sovereign immunity and consents to suit, if necessary, to resolve disputes concerning the interpretation of this Agreement.

16.3 *Submission to Jurisdiction*—For the purpose of resolving disputes regarding this Agreement, or arising therefrom, the Government, ATN and GT & T shall submit themselves to the jurisdiction of the courts of Guyana. Without prejudice to the above, and any other provision of this Agreement, the Parties may agree in writing to resolve any dispute between them regarding this Agreement, or arising therefrom, by arbitration conducted by ICSID and when they so agree the dispute shall be referred to ICSID.

Defendant relies upon subsection 16.2's broad waiver of immunity, while Guyana cites subsection 16.3's specific mutual submission for purposes of litigation to jurisdiction in the courts of Guyana, and nowhere else.

 As a general rule of interpretation, language purporting to effect a waiver of sovereign immunity should be construed narrowly. *See Corzo v. Banco Central De Reserva Del Peru,* 243 F.3d 519, 523 (9th Cir.2001) ("the waiver exception to sovereign immunity must be narrowly construed...a foreign sovereign cannot be sued in the United States unless it could have contemplated that its actions would subject it to suit here"); *see also Hwang Geum Joo v. Japan,* 172 F.Supp.2d 52, 59 (D.D.C.2001). Indeed, the Supreme Court has instructed that a foreign sovereign may not be deemed to have voluntarily waived immunity to suit in the United States unless the language of waiver is explicit to that effect. *See Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 442–43, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) ("nor do we see how a foreign state can waive its immunity under § 1605(a)(1) by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States"); *Wasserstein Perella Emerging Markets Finance, LP v. Province of Formosa,* 2000 WL 573231, at \*4 (S.D.N.Y. May 11, 2000) ("explicit waiver is generally found when the contract language itself clearly and unambiguously states that the parties intended waiver, and therefore, adjudication, in the United States").

Subsection 16.2 expresses Guyana's waiver of its sovereign immunity for purposes of its contract with ATN, but gives no intimation that it was ever thereby contemplating suit in the United States, and the subsection's juxtaposition immediately below a choice-of-law selection clause (specifying the law of Guyana) and above a forum-selection clause (specifying the courts of Guyana) in the only section of the entire contract devoted to the resolution of disputes suggests strongly to the contrary.

Unable to demonstrate an explicit waiver by subsection 16.2 of the contract alone

when considered in context, ATN claims that Guyana is otherwise implicitly subject to suit in the United States under the FSIA's "commercial activity" exception, 28 U.S.C. § 1605(a)(2). The commercial activity exception to the FSIA provides that a foreign state shall not be immune from any suit:

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States. 28 U.S.C. § 1605(a)(2).

The FSIA defines commercial activity as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). Guyana's contractual relations with ATN are undisputably commercial in nature.

 However, none of the categories of the commercial activity which would as a matter of law operate to subject Guyana to suit in a court of the United States encompass either party's activity under the contract at issue here. Guyana—not the U.S.—was the situs of the commercial activity of both parties: ATN's investment of its resources and labor, and Guyana's alleged failure to pay for them in accordance with their agreement.[6] Nor did Gu-

yana's default cause a "direct effect" in the United States within the meaning given that term by the courts in the District of Columbia. In this jurisdiction, the direct effect test is interpreted to require a clause in a contract mandating the fulfillment of contractual obligations *in the United States*. Both *Millicom International Cellular v. Republic of Costa Rica,* 995 F.Supp. 14, 22 (D.D.C.1998), and *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil,* 212 F.Supp.2d 30, 36 (D.D.C.2002), held that to constitute a U.S. centered direct effect the contract alleged to be in breach must have required the parties to fulfill their respective contractual obligations, or at least to make payments, in the United States. *See also Lempert v. Republic of Kazakstan,* 223 F.Supp.2d 200 (D.D.C.2002); *Goodman Holdings v. Rafidain Bank,* 26 F.3d 1143, 1146–47 (D.C.Cir.1994).

In sum, Guyana's activities in connection with the contract with ATN do not fall into any of the commercial activities exceptions to the FSIA. Accordingly, the Court holds that Guyana retains its sovereign immunity insofar as its amenability to suit in the United States.

 To the extent Guyana has waived sovereign immunity at all with respect to its contract with ATN, however, the Court finds that the parties also agreed to a valid and enforceable forum selection clause that mandates that cases be brought in Guyana. Subsection 16.3 of the contract, as previously noted, contains the following language:

> 16.3 *Submission to Jurisdiction*—For the purpose of resolving disputes regarding this Agreement, or arising

---

6. ATN alleges that the contract was ratified in New York, but the "based-upon" predicate for all three exceptions refers to "more than a mere connection with, or relation to" the commercial activity giving rise to exception.

*Saudi Arabia v. Nelson,* 507 U.S. 349, 358, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). No issue is presented here with respect to the inception of the contract.

therefrom, the Government, ATN and GT & T shall submit themselves to the jurisdiction of the courts of Guyana. Without prejudice to the above, and any other provision of this Agreement, the Parties may agree in writing to resolve any dispute between them regarding this Agreement, or arising therefrom, by arbitration conducted by ICSID and when they so agree the dispute shall be referred to ICSID.

Forum selection clauses are *"prima facie* valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances." *Milk 'N' More, Inc. v. Beavert,* 963 F.2d 1342, 1346 (10th Cir.1992); *see also The M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). ATN has made no attempt at such a showing. It does not allege that the clause is invalid for any reason such as fraud or overreaching, nor is there evidence that enforcing the forum selection clause would "contravene a strong public policy of this forum." *2215 Fifth Street Associates v. U–Haul International, Inc.,* 148 F.Supp.2d 50, 54 (D.D.C. 2001). In fact, ATN proffers, and relies entirely upon the validity of the remainder of the contract as supporting its entitlement to the compensation it claims.

While the forum selection clause is thus valid, there remains a question as to its effect: Guyana insists that it is mandatory disputes arising under the contract are to be adjudicated in Guyanese courts if adjudicated at all whereas ATN says it represents merely a mutual consent to jurisdiction, without foreclosing the possibility of

concurrent jurisdiction elsewhere, e.g., a court of the United States.[7]

While there is arguably some inconsistency between the circuits, the Tenth Circuit, in *Milk 'N' More v. Beavert,* 963 F.2d at 1342, the Fourth Circuit, in *Sterling Forest Associates v. Barnett–Range Corp.,* 840 F.2d 249, 252 (4th Cir.1988), and the Sixth Circuit, in *General Electric v. Siempelkamp,* 29 F.3d 1095, 1099 (6th Cir.1994), have all held that a forum selection clause employing the word "shall" and citing a specific locale for the adjudication of disputes, represents a mandatory forum selection clause. In each case the language of the forum selection clause in question was grammatically similar to that of the instant contract's subsection 16.3. In other words, it pointed to a specific venue for adjudication as well as conceding the issue of *in personam* jurisdiction of a tribunal in that venue.

In *Milk 'N' More v. Beavert,* the forum selection clause read: "The parties herein have mutually agreed that said lease and the purchase option agreement contained herein...shall be governed by the laws of the State of Kansas and...that venue shall be proper under this agreement in Johnson County, Kansas." *Milk 'N' More,* 963 F.2d at 1343. In *Sterling Forest,* the forum selection clause stated, "[t]his Agreement shall be construed and enforced in accordance with the laws of the State of California and the parties agree that in any dispute jurisdiction and venue shall be in California." *Sterling Forest,* 840 F.2d at 250. Finally, the forum selection clause in dispute in *General Electric v. Siempelkamp* said, "[p]lace of jurisdiction for all disputes arising in connection with the con-

---

**7.** Citing to the choice-of-law provision of subsection 16.1 Guyana contends that any forum-selection issue (as well as all others arising under the contract) must be resolved by reference to Guyanese law, and submits the affidavit of a Guyanese lawyer to the effect that,

under Guyanese law, the forum selection clause is to be deemed mandatory. The Court concludes that the same result obtains under U.S. law, however, rendering any choice-of-law issue moot.

tract shall be at the principal place of business of the supplier...All matters arising under this contract and any disputes arising hereunder shall be exclusively governed by the law of the Federal Republic of Germany." *General Electric*, 29 F.3d at 1097. In all of these cases, the relevant language, in context, was construed to create a mandatory and exclusive forum selection clause.

ATN cites three cases, one each from the Ninth Circuit and the Second Circuit, and a third from a district court in Utah, in which those courts construed forum selection clauses to be voluntary even though they used the term "shall" coupled with a specific locale. In *Hunt Wesson Foods v. Supreme Oil Company*, 817 F.2d 75 (9th Cir.1987), the Ninth Circuit held a forum selection clause to be permissive even though it read: "[t]he courts of California, County of Orange, shall have jurisdiction over the parties in any action at law relating to the subject matter or interpretation of this contract." *Id.* at 76. As that court wrote: "[a]lthough the word 'shall' is a mandatory term, here it mandates nothing more than that the Orange County courts have jurisdiction." *Id.* at 77.

The Second Circuit followed this reasoning in *John Boutari and Son Wines and Spirits v. Attiki Importers and Distributors Inc.*, 22 F.3d 51 (2d Cir.1994), holding that a forum selection clause stating that "any dispute...shall come within the jurisdiction of the competent Greek Courts," was permissive. *Id.* at 52. The Second Circuit noted that the language of the clause in question stated only that Greek Courts would have jurisdiction, but did not go so far as to exclude jurisdiction in other courts. The Second Circuit went on to note though, that "if mandatory venue language is employed, the [forum selection] clause will be enforced." *Id.* at 53.

The district court case from Utah, *Utah Pizza Service v. Heigel*, 784 F.Supp. 835

(D.Utah 1992), held that "a mandatory [forum selection] clause contains clear language showing that jurisdiction is appropriate in the designated forum and none other." *Id.* at 838. The case can, of course, can be disregarded as it directly conflicts with the holding of its reviewing court, the Tenth Circuit Court of Appeals, in *Milk 'N' More*, which came only three months after *Utah Pizza Service* was decided.

The language of subsection 16.3 of the ATN/Guyana contract explicitly states that the parties agree to submit themselves to the jurisdiction of the courts of a particular place Guyana—and, under subsection 16.1, to have their disputes settled under a particular law—Guyanese law. The import of Section 16 in its entirety is thus apparent: subsection 16.3 of the contract constitutes a mandatory forum selection clause, and ATN and Guyana must, therefore, settle their disputes arising out of the contract in the courts of Guyana.

Finally, Guyana argues in its motion to dismiss that this Court is an inconvenient forum for purposes of this case. The Court agrees. Any presumption in favor of the plaintiff's choice of forum here, of course, is attenuated by the fact that Guyana was added as an afterthought defendant and the usual presumption may, in any case, be overcome when private and public interest factors clearly point towards trial in an alternative forum. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

 To prevail on a motion to dismiss on *forum non conveniens* grounds a defendant must show that an alternative forum exists and that the balance of public and private interests favors dismissal. *See Piper Aircraft*, 454 U.S. at 241, 102 S.Ct. 252. The private interest factors include ease of access to proof, compulsory process to obtain the attendance of hostile wit-

nesses, the cost of transporting friendly witnesses, and other problems that represent impediments to an expeditious and inexpensive trial. The public interest factors to consider are the desirability of clearing foreign controversies from congested dockets, the extent of any local interest in resolving the controversy, and the ease with which the present forum will be able to apply the laws of an unfamiliar jurisdiction. *Id.* at 241 n. 6, 102 S.Ct. 252; *see also Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil,* 212 F.Supp.2d 30, 38–40 (D.D.C.2002).

 ATN contends without offering proof that there are significant problems with the Guyanese legal system, including delays, and potential corruption. ATN was, however, not so concerned about the state of public integrity or the Guyanese judicial system when it voluntarily committed itself and its considerable investment, in its contract with Guyana, to a long term relationship with the government of Guyana and its judicial system. The Court finds no compelling reason to find that the courts of Guyana are not a suitable alternative forum in which plaintiff can receive an adequate and satisfactory remedy. *See Nemariam v. The Federal Democratic Republic of Ethiopia,* 315 F.3d 390, 395 (D.C.Cir.2003).

A balancing of the relevant factors, both public and private, reveals the scale heavily tipped in favor of Guyana's argument that this is indeed an inconvenient forum for everyone save the original defendants who are no longer parties to this case. Virtually all of the relevant evidence is in Guyana. The public factors weigh even more heavily in favor of dismissing this action. The District of Columbia has no connection at all with the controversy. For these reasons, the Court holds that Guyana is a proper forum for this lawsuit.

For the foregoing reasons, it is, therefore, this 7th day of March, 2003,

ORDERED, that defendants Secretary John W. Snow and Jose A. Fourquet's motion to dismiss is granted; and it is

FURTHER ORDERED, that defendant Inter–American Development Bank's motion to dismiss is granted; and it is

FURTHER ORDERED, that defendant Guyana's motion to dismiss is granted; and it is

FURTHER ORDERED, that the Clerk of the Court shall forthwith enter final judgment for all defendants dismissing the complaint with prejudice.

## JUDGMENT

## FOR DEFENDANT

This cause having been considered by the Court on defendants motions to dismiss, before the Honorable Thomas Penfield Jackson, Judge presiding, and the issues having been duly briefed by all parties and the court having rendered its decision granting defendants motions, now therefore, pursuant to the decision of the Court,

IT IS ORDERED, ADJUDGED AND DECREED that the plaintiff ATLANTIC TELE–NETWORK, INC. take nothing on the complaint against the defendant INTER–AMERICAN DEVELOPMENT BANK, JOSE A. FOURQUET, AS U.S. EXECUTIVE DIRECTOR OF THE INTER–AMERICAN DEVELOPMENT BANK, JOHN W. SMON, AS U.S. SECRETARY OF THE TREASURY, and REPUBLIC OF GUYANA and the complaint is dismissed with prejudice.