Christopher Lee PRICE, Appellant,

v.

UNISEA, INC., International Pacific Halibut Commission & Sompo Japan Insurance Company of America, Appellees.

No. S–14184.

Supreme Court of Alaska.

Dec. 7, 2012.

---

Marc W. June, Anchorage, for Appellant.

Charles Jordan, Danielson Harrigan Leyh & Tollefson LLP, Seattle, for Appellee International Pacific Halibut Commission.

Before CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

## OPINION

CARPENETI, Chief Justice.

### I. INTRODUCTION

A worker at a fish processing plant was injured while on the job. His employer, an international organization, asserted that it did not maintain workers' compensation and that it was immune from suit, so the worker filed a negligence action in state court seeking reimbursement for medical expenses, compensation for lost wages, and attorney's fees. The superior court granted the employer's motion to dismiss on immunity grounds. Because the international organization enjoys absolute immunity from suit and it has not waived this immunity, we affirm the superior court in all respects.

### II. FACTS AND PROCEEDINGS

Appellant Christopher Lee Price was hired by International Pacific Halibut Commission

(IPHC) on February 28, 2006. Price was employed as a "port sampler" at Unisea's fish processing plant in Dutch Harbor. His duties included collecting data and supporting information used in the stock assessment of Pacific halibut. Exhibit A, attached to his employment contract (Employment Agreement), specified that "[t]he work is performed in and around fish docks ... [and][w]orking platforms ... are often cold and wet." On August 17, 2006, Price suffered a slip and fall injury while on the job.

IPHC is an international organization with its headquarters in Seattle, Washington. It was established by treaty between the United States and Canada in 1923. President John F. Kennedy issued an executive order designating IPHC as a public international organization on October 23, 1962. Accordingly, it is subject to most of the privileges and immunities of the International Organizations Immunity Act of 1945 (IOIA).[1]

Both parties signed the Employment Agreement, a form employment contract. The agreement stated that "[it] shall be governed by the laws of the State of Washington." The agreement also contained an "insurance and benefits" provision in Paragraph 12, which indicated that workers' compensation would only be available to employees based in British Columbia.

After his injury, Price sought medical and disability benefits under the Alaska Workers' Compensation Act. After failing to respond initially, a representative of IPHC, Michael Larsen, attended a prehearing conference with the Alaska Workers' Compensation Board on January 31, 2007. Larsen explained that as a public international organization, IPHC does not carry workers' compensation insurance and is otherwise immune from suit. A second prehearing conference to discuss unpaid medical costs was held on March 7, 2007. At that hearing, Larsen stated that IPHC's insurer, Premera, was supposed to pay the medical costs resulting from Price's injuries.

In June 2007, after failing to resolve the dispute, Price brought a tort action in state court, alleging that IPHC had negligently failed to secure workers' compensation insurance for him and thereby failed to provide a safe work place. Price claimed that IPHC agreed to comply with applicable state law mandating that employers provide workers' compensation insurance by entering into the Employment Agreement. IPHC moved to dismiss, asserting that it was immune from all forms of judicial process, including the jurisdiction of the Alaska courts and any discovery requests made by Price. Price responded that IPHC had expressly waived its immunity by including a choice of law provision in the Employment Agreement and by agreeing to comply with applicable state law. At the very least, Price maintained, the Employment Agreement was ambiguous and therefore should be construed against the drafter.

Extensive motion practice ensued. Price asked that, at a minimum, IPHC provide his personnel file, the disability policy included in his employee benefits, and documentation of medical bills paid by his IPHC health insurance. IPHC refused to provide these documents, again insisting that its immunity extended to any documents, archives, or records. Price then filed a motion to compel in the superior court, which granted limited discovery. Oral argument was held on IPHC's motion to dismiss.

Following argument, the superior court granted IPHC's motion to dismiss. It found that neither Paragraph 25 of the Employment Agreement (choice of law) nor Paragraph 12 (explanation of insurance and benefits) constituted a waiver of IPHC's absolute immunity. Price filed a motion for reconsideration, asking the trial court to (1) reconsider its decision based on Price's inability to conduct discovery due to assertions of immunity or (2) interpret IPHC's Employment Agreement as a contract of adhesion to be construed against the drafter. The superior court issued an order requesting Price to provide a summary of the discovery materials he wished to pursue. After considering Price's response and IPHC's opposition, the

---

**1.** International Organizations Immunity Act of 1945, Pub.L. No. 79–291, 59 Stat. 669 (codified as amended in scattered sections, including 22 U.S.C. § 288).

superior court denied his motion for reconsideration in September 2008.

Price's claims against Unisea were tried, and in December 2010 a jury found Unisea negligent. Final judgment against Unisea was entered in January 2011. The jury found $1,154,896 in damages, but it apportioned fault 75% to Unisea and 25% to Price; thus, the amount awarded to Price was $993,475. After this judgment was entered, IPHC moved for attorney's fees under Alaska Civil Rule 82. Although the rule normally awards the prevailing party 20% of its fees, IPHC asked for an enhanced award given the extensive motion practice and complexity of the case. Alleging total fees of about $112,000, IPHC sought an award of 30% or almost $34,000. Price filed a motion opposing the grant of attorney's fees, claiming that (1) the proposed amount was excessive, (2) IPHC had not provided proper documentation, and (3) the award should be reduced to 10% of actual fees since the Employment Agreement constituted a fraudulent contract. IPHC submitted billing records totaling only about $89,900. From this amount the superior court deducted about $8,400 because the fees were not reasonably or necessarily incurred and about $3,300 because the fees were incurred post-dismissal. The superior court thus deducted about $11,700 of IPHC's alleged costs. After adjustments, the court entered a final judgment awarding IPHC $15,642.60 in attorney's fees, 20% of actual fees of $78,213. Price filed a motion for reconsideration of the award, which was denied by the superior court in April 2011. This appeal followed.

## III. STANDARD OF REVIEW

 "When materials outside the pleadings are submitted with regard to a motion to dismiss [under Rule 12(b)(6)], the superior court must either explicitly exclude the materials or convert the motion into one for summary judgment under Alaska Rule of Civil Procedure 56."[2] Here, the superior court took the Employment Agreement signed by the parties into account when granting IPHC's motion to dismiss. Although the superior court did not explicitly state that a conversion had taken place, we will treat the decision as a grant of summary judgment under Rule 56.

 We review a grant of summary judgment de novo, "drawing all reasonable inferences in favor of the nonmoving party."[3] Summary judgment will be upheld "if no genuine issue of material fact exists."[4]

 The superior court's interpretation of contracts, specifically the Employment Agreement in this case, raises "questions of law" and is reviewed de novo.[5] The superior court's grant of attorney's fees is reviewed using an abuse of discretion standard.[6] An abuse of discretion occurs when an award is "arbitrary, capricious, manifestly unreasonable, or improperly motivated."[7]

## IV. DISCUSSION

### A. The International Pacific Halibut Commission Is Immune From Suit.

#### 1. The IPHC is an international organization.

Both parties agreed that the IPHC has been classified as an "international organization" by executive order and, as such, is entitled to the protections of the International Organizations Immunities Act of 1945.[8] The IOIA provides that covered entities "en-

2. *Kaiser v. Umialik Ins.*, 108 P.3d 876, 879 (Alaska 2005) (citing Alaska R. Civ. P. 12(b); *Martin v. Mears*, 602 P.2d 421, 425–26 (Alaska 1979)).

3. *Dominic Wenzell, D.M.D. P.C. v. Ingrim*, 228 P.3d 103, 106 (Alaska 2010) (quoting *Nichols v. State Farm Fire & Cas. Co.*, 6 P.3d 300, 303 (Alaska 2000)).

4. *Id.*

5. *Beal v. McGuire*, 216 P.3d 1154, 1162 (Alaska 2009) (citing *Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1000 n. 1 (Alaska 2004)).

6. *Okagawa v. Yaple*, 234 P.3d 1278, 1280 (Alaska 2010) (citing *Krone v. State, Dep't of Health & Soc. Servs.*, 222 P.3d 250, 252 (Alaska 2009)).

7. *Id.* (quoting *Cook Schuhmann & Groseclose, Inc. v. Brown & Root, Inc.*, 116 P.3d 592, 597 (Alaska 2005)) (internal quotation marks omitted).

8. Exec. Order No. 11,059, 27 Fed.Reg. 10,405 (Oct. 23, 1962).

joy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract."[9]

**2. The IOIA provides absolute immunity to international organizations.**

■ Many courts have explored the scope of immunity granted under the IOIA. The main debate is whether the IOIA grants the absolute immunity enjoyed by foreign governments when it was enacted in 1945[10] or whether it was intended to be modified by subsequent statutes affecting the immunity of foreign governments.[11] After the IOIA was enacted, Congress adopted the Foreign Sovereign Immunities Act of 1976 (FSIA),[12] which carved out certain exceptions to immunity for foreign sovereigns.[13] The FSIA made no mention of international organizations, so it was unclear whether the principle of restricted immunity should be adopted by reference or whether Congress intended for international organizations to enjoy a greater immunity than foreign sovereigns.[14] In *Broadbent v. Organization of American States*,[15] one of the early cases to address the application of the FSIA to international organizations, the D.C. Circuit seemed to suggest the latter because the FSIA is "generally silent about international organizations" and "by its own terms the IOIA provides for the modification, where appropriate, of the immunity enjoyed by one or more international organi-

zations."[16] But *Broadbent* never reached the issue because it held that the organization in that case was immune from suit even under a restrictive theory.[17]

The leading case that ruled in favor of absolute immunity for international organizations was *Atkinson v. Inter–American Development Bank*.[18] *Atkinson* overruled an earlier case, *Rendall–Speranza v. Nassim*,[19] in which the district court held that "[i]naction on the part of Congress implies that Congress felt the more restrictive immunity afforded foreign governments under the FSIA was to apply in like fashion to international organizations."[20] In *Atkinson*, the D.C. Circuit disagreed with this reasoning and decided that Congress's failure to include international organizations in the language of FSIA indicated an intent to leave organizational immunity subject to the provisions set forth in the IOIA:

[T]he IOIA sets forth an explicit mechanism for monitoring the immunities of designated international organizations ... [so] therefore ... Congress was content to delegate to the President the responsibility for updating the immunities of international organizations in the face of changing circumstances. This built-in mechanism for updating the IOIA undermines [the] claim that Congress intended a different updating mechanism: automatic alteration of the scope of immunity under the IOIA in accordance with developments in the law governing the immunity of foreign sovereigns.[21]

9. 22 U.S.C. § 288a(b) (2006).

10. *See, e.g., Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) (when Congress enacted the IOIA in 1945, foreign sovereigns enjoyed virtually absolute immunity).

11. *Atkinson v. Inter–Am. Dev. Bank*, 156 F.3d 1335, 1340 (D.C.Cir.1998); *Boimah v. United Nations Gen. Assembly*, 664 F.Supp. 69, 71 (E.D.N.Y.1987).

12. Foreign Sovereign Immunities Act of 1976, Pub.L. No. 94–583, 90 Stat. 2891 (codified as amended in scattered sections of 28 U.S.C.).

13. *See Broadbent v. Org. of Am. States*, 628 F.2d 27, 30–31 (D.C.Cir.1980).

14. *Id.* at 29.

15. 628 F.2d 27.

16. *Id.* at 31–32. "Under the statute, the President can withdraw or restrict the immunity and privileges thereby conferred." *Id.* at 32.

17. *Id.* at 32–33.

18. 156 F.3d 1335 (D.C.Cir.1998).

19. 932 F.Supp. 19 (D.D.C.1996).

20. *Id.* at 24.

21. *Atkinson*, 156 F.3d at 1341.

Because Congress explicitly created a means to modify the immunity afforded international organizations—that is, presidential authority to revoke or modify existing immunity—the *Atkinson* court reasoned that no new mechanism for change need be implied from Congressional silence in a later statute.[22] Given this understanding, at least one other court has concluded that "[a]n international organization that has been granted immunity from suit can only have that immunity restricted in two ways: First, the organization itself may expressly waive its immunity. Second, the President of the United States may specifically limit the organization's immunities...." [23] The *Broadbent* court explained that this system aligned with legislative intent because leaving discretion to the president allowed for quick and easy changes if an organization abused its immunity.[24]

Although the *Rendall–Speranza* court found it unlikely that Congress would intentionally provide a greater immunity for international organizations than foreign governments, allowing greater immunity for international organizations respects the special position held by such organizations. "[I]nternational organizations ... are creatures of treaty and by virtue of treaty stand in a different position with respect to the issue of immunity than sovereign nations." [25] International organizations differ from sovereign nations and private corporations because their actions are governed by the laws of several nations and they are not subject to the policies of any one state.[26] The premise underlying restricted immunity for sovereign nations rests upon an understanding that:

> [the exceptions listed in the FSIA] leave[ ] foreign states free to conduct "governmental" matters through their own citizens. A comparable exception is not applicable to international organizations, because their civil servants are inevitably drawn from either American citizens or "third" country nations. In the case of international organizations, such an exception would swallow up the rule of immunity for civil service employment disputes.[27]

Subjecting international organizations to the restricted immunity codified in the FSIA would effectively eliminate any immunity they currently enjoy. By omitting reference to international organizations in FSIA, "the 1976 Congress wished to clarify that international organizations deserve special protection." [28]

■ Almost every court since *Atkinson* has agreed that international organizations retain the absolute immunity granted when the IOIA was enacted in 1945.[29] However, the Third Circuit recently ruled that the FSIA, and its exceptions to immunity, applied to international organizations.[30] This new interpretation contradicts the precedent established by *Atkinson,* and we decline to follow it. Instead, we adopt the holding of *Atkinson* and its progeny that the IOIA provides absolute immunity to international organizations such as the IPHC.[31]

---

22. *Id.*

23. *Vila v. Inter–Am. Inv. Corp.,* 536 F.Supp.2d 41, 46–47 (D.D.C.2008), *aff'd and remanded,* 570 F.3d 274 (D.C.Cir.2009)(quoting *Mendaro v. World Bank,* 717 F.2d 610, 613 (D.C.Cir.1983)) (internal quotation marks omitted).

24. "[I]n floor debate on the legislation, its supporters pointed again to this provision [granting authority to the president to modify an organization's immunity] as a limitation on commercial abuses by an international organization." *Broadbent v. Org. of Am. States,* 628 F.2d 27, 32 (D.C.Cir.1980).

25. *Broadbent,* 628 F.2d at 29.

26. *See Mendaro,* 717 F.2d at 619.

27. *Broadbent,* 628 F.2d at 34.

28. *Atkinson,* 156 F.3d at 1342.

29. *See, e.g., In re Dinastia, L.P.,* 381 B.R. 512 (S.D.Tex.2007); *Banco de Seguros del Estado v. Int'l Fin. Corp.,* Nos. 06 Civ. 2427(LAP), 06 Civ. 3739(LAP), 2007 WL 2746808 (S.D.N.Y. Sept. 20, 2007); *Ashford Int'l, Inc. v. World Bank Group,* No. 1:04–CV–3822–JOF, 2006 WL 783357 (N.D.Ga. Mar. 24, 2006); *Atlantic Tele–Network Inc. v. Inter–Am. Dev. Bank,* 251 F.Supp.2d 126 (2003); *Bro Tech Corp. v. European Bank for Reconstruction & Dev.,* No. CIV.A. 00–2160, 2000 WL 1751094 (E.D.Pa. Nov. 29, 2000).

30. *See Oss Nokalva, Inc. v. European Space Agency,* 617 F.3d 756 (3d Cir.2010).

31. We add that even if the restrictive immunity of the FSIA applied to international organizations, we have serious doubts that this employ-

### 3. There is no waiver of immunity here.

 Since we conclude that international organizations enjoy absolute immunity from suit, the only way to dissolve such immunity is through an express waiver or presidential order. "[T]he immunity from employee suits may be waived by the members of the international organization, or its administrative directors. However, under national and international law, waivers of immunity must generally be expressly stated."[32] Immunity is not absolute in the sense that it can never be waived, but courts are hesitant to read waiver into a contract when the intent of the organization is unclear.[33]

 Price argues that IPHC expressly waived its immunity in two provisions of the Employment Agreement. First, he contends that the statement in Paragraph 12 that he "shall be entitled to insurance benefits, in accordance with … applicable state law" is a waiver of immunity for claims related to those benefits. Second, he alleges that the choice of law clause in Paragraph 25 of the Employment Agreement is an express waiver of immunity for claims arising under the contract.

In some cases, an express arbitration or dispute resolution clause has been held to constitute a waiver of immunity.[34] However, Paragraph 12 is neither a dispute resolution nor arbitration clause, but rather an explanation of benefits. It explicitly states that IPHC would provide "Worker's Comp" benefits to "B.C. based employees only," in effect putting Price, an employee not based in British Columbia, on notice that he was not entitled to such benefits. The fact that Paragraph 12 used the words "in accordance with … applicable state law" in the context of discussing benefits does not transform it into a clause waiving immunity for suits related to these benefits in state court. The superior court correctly held that even though the provision implied that IPHC should have had insurance in order to comply with "applicable" state law, it in no way authorized suit based on a lack of such insurance. Paragraph 12 does not address immunity and cannot be construed as an express waiver.

 Price's assertion that Paragraph 25 constitutes an express waiver is similarly unpersuasive. Paragraph 25 is a choice of law clause, which states that the interpretation of the contract will be governed by the laws of the State of Washington. Washington courts have held that a choice of law clause, unlike a choice of forum clause, is not a waiver of immunity. "To determine whether a particular agreement shows consent, it is necessary to distinguish between a choice-of-forum clause, on the one hand, and a choice-of-law clause on the other. A choice-of-forum clause is one in which the parties agree on a presiding tribunal."[35] A choice of law clause, on the other hand, indicates which jurisdiction's law will govern the interpretation of a contract if litigation ensues.[36] It does not indicate an agreement on IPHC's part to subject itself to the jurisdiction of any

ment dispute would fall under the "commercial activity" exception.

32. *Mendaro v. World Bank,* 717 F.2d 610, 617 (D.C.Cir.1983).

33. Courts are generally hesitant to find that a sovereign has waived its immunity. *See C & L Enters., Inc. v. Citizen Band of Potawatomi Indian Tribe of Okla.,* 532 U.S. 411, 418, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001) ("to relinquish its immunity, a tribe's waiver must be 'clear'"); *Allen v. Gold Country Casino,* 464 F.3d 1044, 1047 (9th Cir.2006) ("waivers of tribal sovereign immunity may not be implied"); *State Commercial Fisheries Entry Comm'n v. Carlson,* 65 P.3d 851, 874–75 (Alaska 2003) ("waivers of sovereign immunity imposing monetary liability on the federal or state government must be narrowly interpreted").

34. *See, e.g., C & L Enters., Inc.,* 532 U.S. at 414, 420, 121 S.Ct. 1589 (tribe waived immunity from suits to enforce an arbitral award in state court by signing arbitration clause); *Nenana Fuel Co. v. Native Vill. of Venetie,* 834 P.2d 1229, 1232–33 (Alaska 1992) ("remedies on default" clause was waiver of immunity); *Native Vill. of Eyak v. GC Contractors,* 658 P.2d 756, 757–58 (Alaska 1983) (arbitration clause in contract was waiver).

35. *Kysar v. Lambert,* 76 Wash.App. 470, 887 P.2d 431, 440 (1995) (citing *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 587–88, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991)).

36. *See C & L Enters.,* 532 U.S. at 415, 419, 121 S.Ct. 1589 (holding that although arbitration clause is waiver of immunity, choice of law clause merely dictates which state's law will govern disputes after arbitration occurs).

court. As the superior court explained, "[t]he choice of law provision would act as a springing clause, contingent upon a future waiver that might never take place."

Price claims that even if neither provision constitutes an express waiver of immunity, Paragraph 12 is ambiguous at best and should be further analyzed by the court. The superior court rejected his argument and we similarly disagree. In the absence of express waiver, IPHC is immune from suit.

### B. Price Was Not Entitled To Further Discovery On Immunity And Waiver.

 Price argues that the superior court should have allowed more discovery on the immunity and waiver issues. The superior court did permit limited discovery on the topic of immunity before issuing a judgment on the motion to dismiss.[37] As the court explained when denying Price's motion for reconsideration, "the Court granted Plaintiff's motion to compel discovery in the form of initial disclosures and specific documents identified by Plaintiff." After the court granted the motion to dismiss, it accommodated Price's repeated complaints regarding discovery, but first required a list of specific documents he sought. After receiving this list, the court denied Price's request for further discovery, explaining that "the discovery sought would not be likely to provide information ... in support of Price's contention that the IPHC waived its immunity." Price still believes that he was entitled to more discovery on this issue, particularly regarding how IPHC intended to resolve disputes arising from the Employment Agreement.

 The IOIA states that "[i]nternational organizations, their property and their assets, wherever located, and by whomsoever held, shall enjoy the same immunity from suit *and every form of judicial process* as is enjoyed by foreign governments...."[38] IPHC contends that this immunity to all forms of judicial process includes subpoenas and discovery requests except those that will materially change the court's jurisdictional analysis. "[I]mmunity, where justly invoked, properly shields defendants not only from the consequences of litigation's results but also from the burden of defending themselves."[39] Accordingly, "[t]he premises, archives, and communications of international organizations are shielded from interference by member states...."[40] Discovery requests seeking to access these internal documents are shielded under IPHC's immunity.

Price relies on *Tuck v. Pan American Health Organization*[41] and *Polak v. International Monetary Fund*[42] to support his assertion that "[w]here jurisdictional issues are in dispute, a party has a right to limited discovery." Although this premise may be true, his analysis skews the holdings of these cases. The *Tuck* court stated in a footnote that "because the issues often are so intertwined, it may be impossible in some suits to resolve a claim of immunity without first conducting a limited factual inquiry."[43] However, the court went on to say that "[s]uch is not the case here" because the court had already determined that the international organization being sued was entitled to immunity under the IOIA.[44] *Tuck* does not support an assertion that a party has a *right* to any discovery. *Polak* involved a situation

---

37. Price believes these orders were mischaracterized as limited discovery. Although he admits that he received access to his personnel records due to the court's order, he maintains that these documents were insufficient to fulfill the initial disclosures to which he was entitled under Alaska Civil Rule 26.

38. 22 U.S.C. § 288a(b) (2006) (emphasis added).

39. *Tuck v. Pan Am. Health Org.,* 668 F.2d 547, 549 (D.C.Cir.1981) (quoting and citing *Dombrowski v. Eastland,* 387 U.S. 82, 85, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967)) (internal quotation marks omitted).

40. *Mendaro v. World Bank,* 717 F.2d 610, 615 (D.C.Cir.1983) (citing RESTATEMENT OF FOREIGN RELATIONS LAW OF THE UNITED STATES (Revised) § 465 (Tentative Draft No. 4, 1983)).

41. 668 F.2d 547 (D.C.Cir.1981).

42. 657 F.Supp.2d 116 (D.D.C.2009).

43. *Tuck,* 668 F.2d at 549 n. 4 (citing *Forsyth v. Kleindienst,* 599 F.2d 1203 (3d Cir.1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981)).

44. *Id.*

similar to this case, where the plaintiff requested a stay of decision in order to conduct limited discovery on the scope of immunity of an international organization.[45] The court noted that "limited discovery may be proper if pertinent facts bearing on the issue of jurisdiction are in dispute," but "the only pertinent fact bearing on the jurisdictional issue is whether the defendant has ... expressly waived its immunity...."[46] Instead of limiting his discovery requests to the existence of such a waiver, the plaintiff wanted "a broad range of information relating to the defendant's liability in, and immunity from, prior tort claims."[47] Therefore, the court denied the plaintiff's requests for further discovery.

Price did not limit his discovery requests to documents regarding immunity and waiver, but he also wanted information on IPHC's intended dispute resolution process, IPHC's other employment contracts, IPHC's payroll information, IPHC's attempts to obtain workers' compensation in other forums, and other litigation involving IPHC. The superior court did not err in holding that Price's discovery requests were too broad and were not designed to lead to information on the immunity issue. IPHC emphasizes that Price was not entitled to any further discovery on the jurisdictional issue unless the information found could materially change the court's analysis.[48] This rule holds true even under a FSIA analysis.[49] The informa-

tion sought by Price about IPHC's grievance mechanisms and dispute resolution procedures are not relevant to whether it waived its immunity here. Since further discovery would not have changed the superior court's immunity analysis, it was properly denied by the superior court.

### C. The Superior Court Did Not Err In Awarding Attorney's Fees Pursuant To Civil Rule 82.[50]

■ Price argues that the attorney's fees awarded to IPHC are excessive and unreasonable under the circumstances. He maintains that the superior court should have required IPHC to provide him with the basis for its fee claim and allowed him an opportunity to respond. This requested information was subsequently provided, but Price contends that the amount awarded still does not accurately reflect the costs of litigation because it is disproportional to his own costs and IPHC should not be rewarded for "wrongfully resisting minimal discovery and charging depositions that it did not even attend." Price's legal fees totaled $31,473.50. IPHC claims that it incurred $111,988.50 in attorney's fees and requested that it be awarded 30% of those fees due to the extensive motion practice in this case. "That practice included the submission of no less than eighteen memoranda of law citing to over 80 cases as well as attendance at oral argument requested by plaintiff."

---

45. *Polak*, 657 F.Supp.2d at 121–22.

46. *Id.* at 122 (quoting *Osseiran v. Int'l Fin. Corp.*, 498 F.Supp.2d 139, 145 n. 2 (D.D.C.2007)) (internal quotation marks omitted).

47. *Id.*

48. *See Blackburn v. United States*, 100 F.3d 1426, 1436 (9th Cir.1996) (Plaintiff "does not show how allowing additional discovery would have precluded summary judgment. Therefore, the district court did not abuse its discretion in limiting the scope and length of discovery.").

49. *See Peterson v. Islamic Republic of Iran*, 563 F.Supp.2d 268, 274 (D.D.C.2008) ("Requests for jurisdictional discovery should be granted only if the plaintiff presents non-conclusory allegations that, if supplemented with additional information, will materially affect the court's analysis with regard to the applicability of the FSIA."

(quoting *El–Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 671 (D.C.Cir.1996))) (internal quotation marks omitted).

50. We note that different rules govern attorney's fees in workers' compensation cases. *See* AS 23.30.145(regarding fee awards by the Alaska Workers' Compensation Board); AS 23.30.008(d) (regarding fee awards by the Alaska Workers' Compensation Appeals Commission); and Alaska R.App. P. 508(g) (regarding fee awards in appeals from the Alaska Workers' Compensation Appeals Commission). This is not a workers' compensation case—after determining that IPHC had not secured workers' compensation insurance for his employment, Price brought an action at law for IPHC's negligent failure to maintain a safe workplace. *See* AS 23.30.055 (providing that if an employer fails to secure payment of workers' compensation, employee may elect to claim workers' compensation or file an action at law for damages).

Alaska Civil Rule 82(a) commands that "the prevailing party in a civil case shall be awarded attorney's fees...." IPHC was the prevailing party in this litigation since it was found immune from suit. Rule 82(b)(2) explains that "[i]n cases in which the prevailing party recovers no money judgment, the court shall award ... the prevailing party in a case resolved without trial 20 percent of its actual attorney's fees which were necessarily incurred." No money judgment was rendered here because IPHC was excused from the litigation before trial, so it should presumptively receive 20% of its fees. Rule 82(b)(3) lists factors that may justify a court's deviation from the 20% formula, including complexity of the litigation, reasonableness of the attorney's hourly rates, reasonableness of claims, and bad conduct. The superior court found none of these factors present and used the default 20% formula despite requests by IPHC to raise the proportion to 30% and requests by Price to lower it to 10%.

The superior court found that IPHC had incurred $78,213 of necessary legal fees and awarded 20% of that amount, $15,642.40. This award took into account the extensive motion practice in this case, which spanned well over one year. The superior court removed "unreasonable costs" incurred by IPHC in its calculation, such as those incurred after IPHC's motion to dismiss was granted and those incurred by IPHC in opposing the petition for review before this court. This argument over attorney's fees is indicative of the extensive motion practice that occurred throughout this case. The superior court made its decision after considering IPHC's original motion for attorney's fees and costs, Price's opposition to this motion, and IPHC's reply in support of the motion for fees as well as supplemental supporting documents and declarations. Price then filed a motion for reconsideration and IPHC responded. The court then denied the motion for reconsideration stating that the "fact alone [that IPHC incurred higher fees] does not mean the party who incurred greater fees did so unreasonably." We find no evidence that the superior court abused its discretion in calculating attorney's fees nor is the award unreasonable, arbitrary, or capricious.

## V. CONCLUSION

Because the International Pacific Halibut Commission is an international organization that enjoys absolute immunity from suit and it did not waive its immunity, we AFFIRM the superior court in all respects.

CHRISTEN, Justice, not participating.